## AMERICAN ARBITRATION ASSOCIATION

Wesley and Melissa Manning,
Claimants,
v.
Orkin, Inc., and Anthony Mobley,
Respondents.

Case No. 01-17-0007-3773
Arbitrator Eugenia Benedict

## AWARD OF ARBITRATOR

I, Hon. Eugenia M. Benedict, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, each represented by counsel, at an evidentiary hearing held on January 15-18, 2019, do hereby, AWARD, as follows:

### Findings of Fact

Wesley and Melissa Manning, hereinafter referred to as Claimants bought a house at 2546 Brighton Circle, Biloxi, MS, in May, 2016, for $229,000.00. The previous owner, Marlene Kroll, had a contract with Orkin Pest Control for termite prevention on the house from 2011 and it was in effect at the time of the sale to the Claimants.

The Mannings had the Krolls' termite protection plan transferred to them in late 2016. They were neither given a copy of it by Respondent Orkin nor told of its contents at the time of the transfer. The Claimants discovered wood damage to their home and reported it to Respondent Orkin An inspector came and did a spot treatment of the obviously affected area. Only then did Claimants learn that their coverage did not include protection from Formosan termites, which had supposedly caused the damage, and that their remedies were limited to retreatment alone. At no time, though, was evidence presented that some of the damage might have been caused by subterranean termites.

Respondent Orkin offered to sell Mrs. Manning a policy to include Formosan termite protection but she did not respond. Extensive termite damage was found in an interior garage wall and the exterior side of the same wall facing a courtyard from the bottom of it to the soffit. Damage was found in another wall in the courtyard and its interior side in the living room. The Claimants discovered

1



EXHIBIT
1

additional damage to a decorative beam in the living room ceiling, baseboards in several rooms, the kitchen wall above the sink, and several areas including the children's playroom. Obviously, termites had managed to infiltrate the home aggressively. A live Formosan termite was spotted in the courtyard and Respondent Orkin concluded that most, if not all, damage had been caused by non-covered Formosan termites.

Respondent Orkin suggested another spot treatment but Mrs. Manning refused. Mrs. Manning contacted an attorney, Thomas Campbell, who aided her in filing a Complaint with the Mississippi Department of Agriculture and Commerce, (hereinafter referred to as the MDAC, the agency which regulates the Pest Control industry in Mississippi). The MDAC reviewed the history of Orkin's involvement in the home and discovered that the Dosage Sheet for the initial treatment for the previous owners, the Krolls, in 2011, showed a Post Construction (Conventional) treatment had been performed.

On March 15, 2017, MDAC Bureau inspector, Dr. Timothy Lockley, conducted an inspection at the Manning property pursuant to the complaint filed by Mrs. Manning. Dr. Lockley's report to Orkin included the following:

> Records show the structure was treated September 20, 2011, using Termidor termiticide. According to the Orkin Termite Dosage Sheet, a total volume of 119.4 gallons was used to treat this house. This Dosage sheet lists the treatment as a Post Construction (conventional treatment). Upon inspection of the home, there were no indications that the bricks on the house had been drilled in order to treat masonry voids in the foundation walls. There is no indication on the dosage sheet of any calculation to provide for the termiticide solution required to treat these areas. Mississippi regulations require the treatment of foundation walls when performing this type of termiticide treatment. Failing to adequately treat the structure is an alleged violation of subsection 118.03(2) of the regulations. You are charged with **one** violation. …..

> Each violation of the rules and regulations of the Department or any of the laws governing professional services may result in the levy of a civil penalty in the amount of $5,000.00, and/or other penalties. Miss. Code of 1972, Section 69-25-51. You are charged with **one** violation.

2

Even after receiving a copy of the Complaint Mrs. Manning had filed with the MDAC and notice of a pending fine from the agency, Respondent Orkin did not perform a conventional treatment at the Manning home and did not inform the Claimants that they were not going to do so. Mr. Campbell assisted Mrs. Manning in filing a Demand for Arbitration.

The MDAC provided the Claimants a copy of the policy they had accepted. The Respondent Orkin had still not shown it to them. Upon reading the contract, it was clear to Mr. Campbell that it did not, on its face, comply with the regulations and requirements of the State of Mississippi. For treatment of a house after it has been built (post construction), the MDAC requires a Pest Control company licensed by the state to perform a Conventional Treatment involving specific steps. They include at least the following:

> trenching around the structure no closer than six (6) inches from the edge of the building and drenching the ground in the trench with the proper amount of chemicals;
>
> drilling the concrete blocks of a foundation deeply enough to get the proper amount of the chemical down to each footer;
>
> drilling through the concrete blocks to get the proper amount of the chemical to the dirt under the slab on which the building has been built;
>
> drilling holes in the concrete slab no closer than six (6) inches from the edge of the building and no farther than twelve (12) inches and applying the proper amount of the chemical through those holes;
>
> treating all areas where utility pipes have penetrated the termite barrier, and
>
> where abutting areas of concrete have been poured at different times, the joint between them, called a "cold joint", must be drilled because a separation forms as the concrete portions dry at different times. These holes also are to be no farther than twelve (12) inches apart. The proper amount of the chemical must then be applied through these holes for adequate protection against termites.

The only exception allowing a company to do a lesser treatment is if the contract states on its face, in bold type, the exact following language: "Termidor® Exterior Perimeter/Localized Interior" and the areas treated and the application methods used shall be clearly defined on the graph and application records. The contract

must include copies of the Inspection Graph showing areas to be treated and the Dosage Sheet of the calculations and amount of termiticide to be used. The homeowner is also to sign a document stating that they agree to the lesser EP/LI treatment. Copies of all documents are to be given to the customer with the originals to be kept by the Respondent Orkin for as long as the contract is in effect. Respondents did not perform any of those actions in their contracting with the Mannings. The Claimants' contract with Respondent Orkin clearly did not include that language or any reference to Respondent Orkin's intention not to do the required full Conventional treatment. As mentioned before, Respondents did not provide them with a copy of it or the other required documents. Furthermore, Claimants' certainly did not sign a separate sheet declaring that they accepted the lesser EP/L treatment. Therefore, under Mississippi regulations, only a Conventional treatment would fulfill Respondent Orkin's obligation to the customer or to a subsequent transferee.

Respondent Orkin's Inspection Graph and Dosage Sheet for the initial application for the Krolls in 2011 reveal a contradiction. The graph indicates that procedures to be done were those of a Conventional treatment but inspection of the property clearly showed these were not done then and have not been done. The Dosage sheet indicates an amount of termiticide insufficient for a full Conventional treatment and more consistent with that done for an EP/LI in violation of the MDA requirements.

Respondent Orkin's contract states that it is governed by Georgia law. At trial, Respondent Orkin inferred that it is not bound to comply with Mississippi requirements yet offered no authority or proof to sustain that defense. It showed the "PP" notation on the contract, explained that that means "Perimeter Plus" in Orkin's practice in Mississippi and indicated that such language should be sufficient to notify a potential customer that a limited treatment, not the Conventional one, was being offered. Respondent Orkin presented no authority for the substituted verbiage but said that the MDAC did not often review their contracts for compliance.

Claimants' allege that:
Respondent Orkin did not provide them with a copy of their contract and did not inform them of its restrictions;
Respondent Orkin did not include the language mandated by the Code of Mississippi and the MDAC Regulations or the supporting documents for the lesser EP/LI treatment;

4

Respondent Orkin has not performed the required Conventional treatment to date and did not inform them of that fact;

Respondent Orkin falsified its own records to show a Conventional treatment was being sold and planned for when it did not intend to perform what was promised;

Respondent Orkin collected fees while defrauding the Claimants;

Respondent Orkin committed intentional deception amounting to Fraud and is, therefore, liable for all damages suffered by Claimants.

## Discussion of Applicable Law

### I.

### Withholding of Material Facts of Termite Protection Contract from Claimants

When the Claimants were offered a transfer of the previous owners' termite prevention policy, they accepted and paid Respondent Orkin the requested fee. This transaction raises questions of deceit from its very beginning because Respondent did not deliver a copy of the contract and the required supporting documents to the Mannings *prior* to their acceptance and not before Claimants filed a demand for arbitration.

It is basic contract law that for a contract to be enforceable, the parties making the "agreement" need to have a meeting of the minds of the relevant material facts. There is no question that Claimants did not know what the contract they had paid for included or excluded. Respondent Orkin's position was that they were not responsible for the Claimants not having read the document and being aware of its "limitations". It defies reason to assert, as Respondent Orkin has, that since the Mannings did not demand a copy of the agreement before they agreed to its transfer, that they were uninformed by their own negligence, and are, therefore, silenced in any protest attempt. Respondent Orkin stated that its employee who had sold the policy initially to Marlene Kroll had shown her the contract, discussed the reduced cost of an EP/LI treatment and that she appeared to agree to the reduction of both care and cost. None of that was done for Mrs. Manning yet Respondent Orkin asserts its innocence while hiding the contract seemingly behind its back.

The State of Mississippi requires its licensed Pest Control salesmen to make full disclosure of any contract for service and any limitations allowed on required levels of treatment. The State and the MDAC couldn't make their requirements any more clear. The Rules of the Miss. Dept. of Ag., Subpart 3, Chap.11, Pt. 3, 115state:

5

**MDAC Regulations applicable to wood destroying insect licenses and permits only:**

115 Contracts 1. Persons holding a license in the category "Wood destroying insect control" as covered by subsection 104.04(1) of this chapter shall enter into a written contract with the person employing him. Work performed under the contract shall comply with the regulations set forth in subchapter 01 of this chapter. 2. A contract shall not be issued unless an approved termite treatment is performed, except as covered in subsection 115(15) of this chapter. 3. Said contract for control of and protection from termites and/or other structural pests shall guarantee the performance of the work to the original owner and subsequent owners for at least one year after initial date of contract to the original owner and that said property meets the minimum standards set forth in these regulations for such work, **unless an exception of the minimum standards is clearly set forth in a separate statement on the face of the contract.** (Emphasis added). Exceptions of the minimum standards shall not exclude treatment requirements, as stated on the product use label, of the pesticide being used. **Exceptions of the minimum standards for such work are limited to structures where treatment is not possible because an area of the structure is inaccessible and/or treatment will result in defacement to the actual structure that is unacceptable to the owner of the property. Exceptions of the minimum standards for such work shall not be allowed unless the owner of the property signs in a space next to each exception on the face of the contract acknowledging that the work is not being performed to minimum standards.** (Emphasis added). Exceptions of the minimum standards do not eliminate the requirement for termite treatment to be performed. 4. **A copy of a work order covering a complete plot or diagram showing the location of visible damage and an outline of the work to be carried out shall be given to the property owner and one copy shall be maintained by the operator with a copy of the contract for as long as the contract is in force.** (Emphasis added). 5. The contract must clearly state in bold letters on the face of the contract if damage repairs are included or if only retreatment is provided.

There is no question that Mrs. Manning did not see much less sign a contract

with Respondent Orkin, that any alleged "contract" did not disclose areas that were not treated because they were inaccessible or that she agreed to any acceptance of the lesser EP/LI treatment.

Respondent Orkin committed Fraud by withholding material facts and is, therefore, responsible for any and all damage incurred.

## II.

### Contract Did Not Comply with Regulations of the MDAC

The Pest Control industry deals with very dangerous chemicals whose properties and usage are not understood by the general public. Therefore, the various states in the United States create agencies to regulate and supervise their actions and to protect the public from the possibility of fraud from and/or misuse of the substances by licensed pest control companies. In Mississippi, that agency, as mentioned above, is the MDAC. The MDAC has created regulations for such operators which they must follow precisely or risk fines and other possible penalties. One category of those regulations deals with the minimum standard of treatment for a home after it is built. That is called a Post Construction or Conventional treatment. Those procedures are outlined in the Findings of Fact section above. As stated above, Mississippi does allow a very limited exclusion from that thorough treatment IF specific wording appears in BOLD print on the face of the contract offered to a potential customer. There is absolutely no dispute that the "limiting" language is NOT in the Mannings' contract so the Pest Control company must provide the Post Construction or Conventional treatment in order to comply with the State's regulations. Respondent Orkin argued that even though it failed to comply with the Mississippi Regulations, that such does not give the Mannings the right to sue in Tort. They argued that only the contract itself, in a suit alleging breach, could be sued upon and that Claimants could not prevail.

Respondent Orkin cited several cases in support of their assertion that Claimants have no basis to sue them in Tort. Palmer v. Orkin Exterminating Company, Inc., 871 F.Supp. 912, (S.D. Miss.1994); Smith v. Orkin Exterminating Company, Inc., 791 F.Supp. 1137, ( S.D. Miss. 1990); Johnson v. Orkin Exterminating Company, Inc., 746 F.Supp. 627 (E.D. La.1990) and Orkin Exterminating Company, Inc., v. Stevens, 130 Ga. App. 363 (1973). Each of these cases deal only with breaches of contract. Therefore, reliance on them is misleading because NONE of them involves an allegation, let alone proof, of Fraud in the form of withholding material facts as found here.

This entire line of defense is frivolous and without basis.

### III.

### Whether the Law of Mississippi or Georgia Governs the Contract at Issue

Respondent Orkin asserted that since the contract stated that Georgia law governed the agreement that they did not **have** to satisfy the regulations of Mississippi.

In a Conflicts of Law argument, a factfinder usually would consider:
where the contract was executed,
where the action of the contract was to take place,
if one state had a greater interest in or effect from the contract's performance, and
if one state's *procedural* law applies and the other's *substantive* law applies IF no choice of law were stated in the document.

In this case, though, the contract does say that Georgia law will be applied in any dispute.
However, when dealing with a regulated industry such as the Pest Control business, a state's Regulations are implied in every contract so compliance with them is not an option. Also, all of the factors listed above indicate that Mississippi law should apply here. Respondent Orkin did not offer **any** logical reason or legal authority for Georgia's law to be considered so Mississippi law will be followed here.

### IV.

### Intentional Concealment of Material Facts

Respondent Orkin's consistent position has been that the term "Perimeter Plus", loosely defined in Orkin's practice as a treatment of only the perimeter of a house plus whatever portions inside require being protected in a Conventional treatment, such as a utility penetration or where actual damage is found, *should* be understood as *equivalent* to promising an EP/LI treatment. Understood by whom? Pest Control employees are not usually offering contracts to customers who are entomologists or chemists who specialize in hazardous materials. They are selling to teachers and equipment operators, such as the Claimants, and just regular folks whose jobs involve something other than controlling pests. To suggest that the

8

general public can and should make the distinction of Respondent's own interpretation of "PP" is absurd.

The Pest Control business is so highly regulated that a company performing the service **has no discretion** in how they word the warning about limitations in the service being offered. Termidor was the termiticide used in treating the Manning's home so it must be identified in the contract. The contract either says "Termidor® Exterior Perimeter/Localized Interior" or it doesn't. Period. If it doesn't, the only *legal* treatment that can be done is the Conventional or Post Construction one outlined above. Furthermore, a company cannot just estimate how they determine concentrations of the termiticide, where and how to apply it and whether they get around to making annual, **thorough** inspections and reporting the true findings to their customers. A violation of any of the Regulations pertinent here is a crime in Mississippi.

At trial, evidence showed that Respondent Orkin had written on its Inspection Graph that procedures required in a Conventional treatment had been performed in 2011. However, the Dosage Sheet for the same time showed that significantly less termiticide was used than appropriate for such a treatment. The dosage was more typical of one which would have been used for the more limited EP/LI procedures.

When a company falsifies its own records to indicate what is required when they are actually performing much less, fraud is the only conceivable conclusion. Respondent Orkin was clearly under-performing but lying openly to the MDAC and silently to the Krolls and later to the Mannings. Respondent, Orkin Exterminating Company, Inc., is one of the largest and oldest pest control companies in the United States. There can be no credible argument that they did not know that what they were doing was fraudulent.

Respondent Orkin has argued that any perceived "wrong" committed against the Krolls, the original owners of the house and their initial customers, does not carry forward to subsequent transferees of the contract. What they have failed to admit, though, is that a "wrong" they committed against the Krolls was continued against the Mannings.

Respondent Orkin has **never** done the proper treatment and they did not inform the Krolls or the Mannings of their failure to do so. The truth is not that the Mannings are trying to claim an offense against the Krolls but the repetition of the same wrong against them. Respondent Orkin began their withholding of material facts from the Mannings when the contract was first offered to Mrs. Manning, was continued by Respondents' failure to

9

inform them that the proper treatment was not done initially or done even during the Mannings' contract period. A continuous multi-issue concealment is NOT a mistake; it is a cover-up and an intentional fraud. Respondent Orkin's argument is without fact or basis.

> The actions of Respondent Anthony Mobley, an employee of Orkin, Inc., were within the scope of his employment. No evidence was presented that showed independent acts by him that would justify his being held personally liable for damages in this case. Any and all claims against him are hereby dismissed.

Therefore, Respondent Orkin is solely responsible for all Claimants' damages.

## V.

### Fraud

There is no dispute that Respondent Orkin withheld the terms of the offered contract and the company's continuous failure to perform the proper treatment from the Mannings.

Fraud consists of some deceitful practice or willful device, resorted to with intent to deprive another of his right, or in some manner to do him an injury. "To make a party liable in an action at law for false representations, it must be shown that he made the representations with actual knowledge of their falsity, *or without knowing whether they were true or false, or under such circumstances that he ought to have known that they were false, whether he did or not.*" (Emphasis added.) H.D. Sojourner & Company v. Joseph, 186 Miss. 755, 191 So. 418 (Miss. 1939). See also 23 Am. Jur., Fraud and Deceit, Section 20, p. 773; 37 C.J.S., Fraud, Section 19, p. 254 and (c) Section 21, p. "In the sense of a court of equity, (Fraud) properly includes all acts, omissions, and concealments which involve a breach of legal or equitable duty, trust, or confidence justly reposed, and are injurious to another, or by which an undue and unconscientious advantage is taken of another. 1 Story, Eq. Jur. §187; Howard v. West Jersey & S.S. R. Co., 102 N.J. Eq. 517, 141 A. 755, 757 (N.J. 1929); in accord, Black's Law Dictionary, 2nd ed., p. 789.

Chris Gorecki, the president-elect of the National Pest Management Association and the Chairman of the Georgia Structural Pest Control Commission which "...writes the rules and regulations for pest control operators in the State of Georgia"... Transcript of hearing, p. 459,460, is also the Vice President of Operational Support at Orkin where he has been employed for over two decades. As such, part of his responsibilities is for oversight of how the company performs

10

its promised services. In 1997, he started a quality assurance program at Orkin to inspect homes under contract with the company if substandard treatment was suspected. Members of the team working with him would "…go into (the) branches and sample their recent termite jobs to determine whether or not the service they were selling was appropriate in their jurisdiction and whether or not the service they provided when they sold those termite services complied with appropriate service protocols"…Transcript, p. 464. Those results were eventually passed on to "…division presidents". Transcript, p. 465.

One would expect that these inspections would include whether the contracts for treatments of these homes and the treatments they had received complied with the given state's laws and regulations. However, in spite of his long experience with Orkin and his present position, Mr. Gorecki said that he did not know what the standard Orkin form in Mississippi *actually* stated, if it complied with the Mississippi Regulations or even what the Regulations require of his company. He did admit, too, that Orkin's standard contract uses its own code, "PP", and that the company intended to perform (only) a "PP" or EP/LI and not a Conventional one. He testified that the lawyers at the home office in Atlanta, Georgia, are responsible for assuring that Orkin's contracts comply with the laws and regulations of the various states in which the company does business including in Mississippi.

The very existence of the "quality assurance program" indicates that Orkin knows what an adequate treatment is, knows how to recognize inadequate treatment, knows how to provide remediation and is financially capable of doing so. During trial, Mr. Gorecki was asked by Claimants' counsel:

> If you thought there was something important going on at this corporation that needed to be addressed and it was going to cost hundreds of thousands of dollars to correct, you could schedule an appointment and walk into the office of the CEO at Orkin or Rollins (previous owner of Orkin) and advocate for these resources to get done; correct?"
> Gorecki, "Yes". Transcript, p. 467.

A company commits Promissory Fraud when it knows or should know what is required of it to perform legally in a state yet knowingly fails to do so and has no intention of performing the treatment required by the State's Regulations. "In cases of fraud, relief cannot be based on future promises, 'except in some cases when a contractual promise is made with the present undisclosed intention of not performing it'." Bank of Shaw, 573 So.2d 1355, 1360 (Miss.1990) ; Holland v.

11

Peoples Bank & Trust Co., 3 So.3d 94, 100 (Miss. 2008). In this case such alleged intentional ignorance of required behavior in a strictly regulated industry is equivalent to *scienter* sufficient to support the Manning's claim of Fraud.

Furthermore, in a coastal area such as Biloxi, MS, the site of the property in issue, the company knew that Formosan termite activity was widespread and very destructive especially if proper precautionary treatments were not taken. The company routinely promised a "PP" treatment when a Conventional one was mandatory since Orkin's contract did not have the necessary language to activate an exclusion allowing for the lesser treatment. When fraud is the chosen direction of a company's "service" to its trusting customers and it tries to limit its responsibility for the damage it causes, it is reprehensible. It was Respondents' company policy to undertreat what their contract appeared to offer and withhold that information from the Claimants. Such fraud makes Respondent Orkin liable for all damages in this case.

## VI.

**Damages**

**1.     The Manning home:**

Although the contract at issue excluded repairs, the fraud committed by Respondents eliminates the terms and restrictions stated in it. Telephone Man, Inc. v. Hinds County, 791 So.2d 208 (Miss. 2001). The next question then is what the elements of damage are.

The Manning's home has a brick exterior but it is the wood structure inside that is damaged and, at this point, none of the experts could estimate how much of it would have to be repaired to "make the Mannings whole". How does one get to the wooden areas without dismantling the walls? According to Chris Annello, the Claimants' expert witness in construction, one cannot. He testified that the brick in areas of known or suspected termite damage would have to be removed. Also, the foam board used within the walls and the sheetrock on their interiors would have to be examined and, perhaps, removed as well. That is certainly true for the garage wall already known to be practically destroyed by termites and its exterior wall in the courtyard. Baseboards must be removed where damage has already been found in the living room, upstairs in the children's' playroom and maybe elsewhere to determine how far the damage has advanced. The bookcases on either side of the living room fireplace and a decorative beam in the same room are at least partially

damaged and must be removed, inspected and repaired. Mr. Annello said the living room ceiling may be damaged but that cannot be known yet. The Mannings found extensive damage in the kitchen wall above the sink and that was confirmed by Respondents' inspectors as well as those from the MDAC.

Mr. Annello also said that any new brick installed would not match that which does not have to be removed since matching is practically impossible with brick more than five years' newer than the original ones. Their home was built in the 1980's and any repairs would be made during or after 2019. What would be the options then? Do the Mannings have to settle for a hodge podge of differently colored brick or do they have to paint all of it, original brick and newly installed as well, after reconstruction? That would be expensive and would require occasional repainting as well. Should they have to settle for such a compromise? How much would it cost to have new brick on the entire house? That was not answered during the trial so there is no evidence to consider.

Mr. Manning testified that his opinion of the value of his house prior to finding termite damage has appreciated from the $229,000.00 purchase price they had paid in 2016 to approximately $250,000.00 in 2019. He cited having seen that amount for his home on a Zillow search. Respondent Orkin objected to the absence of hard data of present value. Mr. Manning did say that he did not think any purchaser except one planning to repair it and selling it soon thereafter, known as a "flipper", would buy it in its present damaged state but no other evidence was presented on that point.

The bottom line is that no one can predict, at this point, how much damage might be in the Manning's' home or what it will take to repair it. The measure of damage to real property in Mississippi is the cost of repair if the extent of damage is known OR the diminished value of the property if the extent is not known. In this case, it is clear from testimony that diminished value will be the measure.

### 2. Mental Anguish

The Mannings testified that both of them have been very worried about not only the damage they have already found in their home but what may still await discovery. They are unable to do even minor termite damage repair themselves and know there is no way they can afford to fix their home at their own expense. Neither has been able to sleep well since discovering the extensive termite damage in their home. They have three young children and are concerned about the potential effect on their well-being if they lose their home. Mr. Annello's opinion

was that the family would have to move to another location during the repairs as the dust from many areas being repaired simultaneously would make their home uninhabitable. It is common sense to conclude that if this young family has to move twice in order for their home to be repaired that they will experience additional mental anguish for which they should be compensated.

### 3.    Cost of relocation

Mrs. Manning testified that she had found suitable alternate housing in the same district for about $1,800.00 a month. She said she would prefer to have another four bedroom house but three would suffice, with the children sharing a room, so long as there was an empty one available for Mr. Manning to sleep in during the day as he works at night.

In addition to rent, the Mannings would have utilities' charges at both houses since the repair crew would need electricity and water while working there. The Mannings would have to continue paying insurance premiums of $1,023.17 on their home and perhaps renters' insurance on the temporary one as well.

If furniture cannot be sufficiently protected from dust and debris during the repairs, the Mannings would have to move it twice. Estimates of approximately $11,189.32 were presented at trial.

## VII.

### Punitive Damages

Respondent Orkin has engaged in a fraudulent scheme for years in Mississippi by knowingly offering contracts which do not meet the minimum standards required by the state. It has brazenly substituted its own code, a "PP", rather than the required verbiage that the Mississippi Legislature concluded was necessary to inform, even warn, the public against in case of a company's purported fraud. Respondent Orkin has thumbed its nose at the law and the regulations pertaining to its business of dealing with hazardous chemicals and taken advantage of trusting customers who are not likely to know that they are being cheated until after damage is found at their homes. Such behavior is legally wrong, is fraud and actually cruel considering how much damage can occur in a short time. Respondent Orkin is fully aware that Biloxi, Mississippi, is known to be a hot bed of not only native subterranean termites but the much more dangerous and aggressive Formosan ones. None of the defenses and limitations Respondent Orkin

14

has written into its fraudulent contracts or argued in this trial have any legal basis since fraud vitiates any contract. Id. at 211; J.A. Fay Egan Co. v. Louis Cohn & Bros., 130 So. 290, 292 (Miss. 1930).

The Mississippi Code allows the awarding of punitive damages under explicit conditions. **Universal Citation: MS Code § 11-1-65 (2013) ; § 11-1-65 - Punitive damages;**

>(1) In any action in which punitive damages are sought:
>
>(a) Punitive damages may not be awarded if the claimant does not prove by clear and convincing evidence that the defendant against whom punitive damages are sought acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud.
>
>(b) In any action in which the claimant seeks an award of punitive damages, the trier of fact shall first determine whether compensatory damages are to be awarded and in what amount, before addressing any issues related to punitive damages.
>
>(c) If, but only if, an award of compensatory damages has been made against a party, the court shall promptly commence an evidentiary hearing to determine whether punitive damages may be considered by the same trier of fact.
>
>(d) The court shall determine whether the issue of punitive damages may be submitted to the trier of fact; and, if so, the trier of fact shall determine whether to award punitive damages and in what amount.
>
>(e) In all cases involving an award of punitive damages, the fact finder, in determining the amount of punitive damages, shall consider, to the extent relevant, the following: the defendant's financial condition and net worth; the nature and reprehensibility of the defendant's wrongdoing, for example, the impact of the defendant's conduct on the plaintiff, or the relationship of the defendant to the plaintiff; the defendant's awareness of the amount of harm being caused and the defendant's motivation in causing such harm; the duration of the defendant's misconduct and whether the defendant attempted to conceal such misconduct; and any other circumstances shown by the evidence that bear on determining a proper amount of punitive damages. The trier of fact shall be instructed that the primary purpose of punitive damages

is to punish the wrongdoer and deter similar misconduct in the future by the defendant and others while the purpose of compensatory damages is to make the plaintiff whole. ...

Although an intentional violation of the MDAC Regulations does not create a private right of action, it **DOES** go to showing intent to deceive. Furthermore, Chris Gorecki testified, as stated above, that he had helped establish a program as far back as 1997 to aid Respondent Orkin in discovering and retreating any homes which had received insufficient initial treatment. In other words, the company **knew** there were problems with inadequate previous treatments, **knew** how to "fix" the problem and has just **chosen** not to do so for the past 22 years. There can hardly be a stronger basis for the imposition of punitive damages than is shown in this case.

## VII.

### Attorney's Fees and expenses

The "American Rule" on attorney's fees is that each party bears his own costs of representation but "...the rule is usually expressed with exceptions encouched therein. One of the main exclusions is the equitable exception". Hall v. Cole, 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed. 2d 702 (1973), the Court explained in no uncertain terms that the rule may be overridden if the equities justify it. It is unquestioned that a federal court may award counsel fees to a successful party when his opponent has acted "in bad faith, vexatiously, wantonly or for oppressive reasons. 6 J. Moore, Federal Practice, paragraph 54.77[2], p. 1709 (2d ed. 1972). In this class of cases, the underlying reason of "fee shifting" is, of course, punitive and the essential element in triggering an award of attorney's fees is the existence of "bad faith" on the part of the unsuccessful party. See Mills v. Electric Auto-Lite Co., 396 U.S. 375, 391-392, 90 S.Ct. 616, 625-626, 24 L. Ed.2d 593 (1970). "The power to award such fees (attorney's fees) 'is part of the original authority of the chancellor to do equity in a particular situation'." Sprague v. Ticonic National Bank, 307 U.S. 161, 166, 59 S. Ct. 777, 780, 83 L.Ed. 1184 (1939).

The American Bar Association (hereafter referred to as the ABA) has established factors to consider in determining if an attorney's fees are reasonable. It states, in the *Model Code of Professional Responsibility,* DR 2-106 (1982), the following:

> DR 2-106 -Fees for Legal Services.99 (A) -A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive

fee.100 (B) -A fee is clearly excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee. Factors to be considered as guides in determining the reasonableness of a fee include the following: (1) -The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly. (2) -The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer. (3) -The fee customarily charged in the locality for similar legal services. (4) -The amount involved and the results obtained. (5) -The time limitations imposed by the client or by the circumstances. (6) -The nature and length of the professional relationship with the client. (7) -The experience, reputation, and ability of the lawyer or lawyers performing the services. (8) -Whether the fee is fixed or contingent.

Mr. Campbell presented evidence that met the requirements set by the ABA and should be compensated in a manner that is clearly not excessive to "a lawyer of ordinary prudence ". However, as the amount of the recovery increases, the attorney's fee should be prudently reduced.

## VIII.

**Itemization of Damages**

| | | |
|---|---|---|
| Incidental | | |
|     Termite Services Paid | $ | 269.91 |
| Compensatory | | |
|     Diminished Value of House | $ | 190,000.00 |
| Utilities (Unusable House) | | |
| Power | $ | 1,537.38 |
| Water | $ | 844.08 |
| Property Tax | $ | 1,970.11 |
| Insurance | $ | 1,023.17 |
| Rental House for six months | $ | 10,800.00 |
| Moving Estimate (two moves) | $ | 11,189.32 |
| Childcare during arbitration | $ | 540.00 |
| Loss of Use of House | $ | 10,800.00 |
| | | |
| Incidental and Compensatory Damages Subtotal | $ | <u>228,973.97</u> |

17

| | | |
|---|---|---|
| Incidental and Compensatory Damages Subtotal | $ | 228,973.97 |
| | | |
| Mental Anguish | | |
|    Wesley Manning | $ | 375,000.00 |
|    Melissa Manning | $ | 375,000.00 |
| | $ | 750,000.00 |
| **Grand Total Compensatory:** | $ | 978,973.00 |
| **Punitive Damages:** | $ | 1,000,000.00 |
| **TOTAL PAYABLE TO CLAIMANTS FROM RESPONDENT ORKIN, INC.** | $ | 1,978,973.00 |
| | | |
| Claimants' Attorney Fees due from Respondent Orkin, Inc. | $ | 600,000.00 |
| Claimants' Attorney Expenses due from Respondent Orkin, Inc. | $ | 31,445.05 |
| **TOTAL PAYABLE TO CLAIMANTS' ATTORNEY FROM RESPONDENT ORKIN, INC.** | $ | 631,445.05 |

The administrative fees of the American Arbitration Association (AAA) totaling $2,400.00 and the expenses and compensation of the arbitrator totaling $6,600.00 shall be borne as incurred.

All payments are due to be paid within thirty (30) days of the execution of this Order.

This Award is in full settlement of all claims submitted to this Arbitration. All claims not expressly granted herein are hereby denied.

So ordered this 29th of July, 2019.

_Eugenia Benedict_
Eugenia Benedict, Arbitrator